UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| DANIEL MOLA, | |
| Petitioner, | |
| v. | CAUSE NO. 3:18-CV-306-PPS-MGG |
| WARDEN, | |
| Respondent. | |

OPINION AND ORDER

Daniel Mola, a prisoner without a lawyer, seeks habeas corpus relief from his conviction for voluntary manslaughter out of the Lake County, Indiana Superior Court. But because he has failed to establish that his conviction was contrary to or involved an unreasonable application of clearly established federal law, the petition must be denied.

Factual Background

There's a lot of anger in this world, and it sometimes manifests itself late at night inside bars where alcohol fueled (and often absurdly trivial) exchanges can lead to bad choices and deadly results. This case involves one of those encounters resulting in one man being shot to death and another on the bad end of a lengthy prison sentence all over a trifle—who had the right to a barstool. The scene played out at Buddy and Pals, a local sports bar that people go to after a round of golf or a softball game. Here's how it turned into the scene of a shooting on the night in question as described by the Court of Appeals of Indiana whose description I presume to be correct because the facts haven't

been rebutted with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). (I will also flesh out more of the facts below.)

> On July 18, 2009, Christopher Elkins ("Elkins") and Mola were at a bar called Buddy and Pal's Place in Winfield, Indiana. Elkins was sitting at the bar area. When Elkins left his seat, Mola took his place. Later, Elkins returned and entered into a "heated" conversation with Mola. Both men appeared angry and yelled expletives at each other. Bar employees then separated the two, and Elkins left the bar area.
>
> Elkins accepted an offer from his friend, James Bannister ("Bannister"), to drive him home. As Bannister and Elkins were preparing to leave the bar, they walked past Mola who was still sitting in the bar area. Elkins shoved Mola's barstool before walking out to the parking lot. After Elkins passed, Mola stood up, loaded a round into his handgun and approached the exit while holding the pistol. A bar employee tried to stop Mola, but Mola continued out to the parking lot.
>
> When Mola reached the parking lot, Elkins and Bannister were near the back of Bannister's vehicle. Mola raised his firearm and yelled to Elkins, "[H]ey[,] [m*f*]." Elkins turned around and asked Mola, "[W]hat are you going to do[?] [S]hoot me[?]" Mola then fired two shots in "rapid" succession at Elkins, striking him in the abdomen. Elkins died as a result of his gunshot wounds.
>
> On July 20, 2009, the State of Indiana charged Mola with murder and carrying a handgun without a license.

ECF 12-13 at 2-3; *Mola v. State*, 2017 WL 5181625, at *1 (Ind. App. 2017).

At trial, the prosecution pursued a conviction on the charge of murder or the lesser-included offense of voluntary manslaughter, and Mola asserted self-defense. Trial Tr. 1544-46, 1550-52. The first trial ended in a hung jury. ECF 12-13 at 3. At the second trial, the prosecution introduced numerous witnesses who observed the interactions between Mola and Elkins inside and outside of the bar and largely agreed on the sequence of events. These witnesses included patrons, security, and waitstaff who were

of varying degrees of familiarity with Mola and Elkins. According to these witnesses, Elkins had developed personal animosity toward Mola for reasons that are unclear, describing him as a wannabe who acted like a cop. *Id.* at 302-303, 635-36. Elkins decided to confront Mola about these concerns that night at the bar and immediately started bullying him; he called Mola "a liar and said he was a punk and all his weightlifting didn't matter." *Id.* at 390. The ensuing argument escalated to the point that Elkins' friend notified security staff. *Id.* at 253. As security staff moved to separate the two patrons, the bullying continued. Elkins knocked Mola's sunglasses from his head and further taunted Mola by stomping on them, and kicking them toward Mola. *Id.* at 636, 690-91, 739-40. Shortly thereafter, Elkins paid his bill and left the bar with a friend who had planned to drive him home. *Id.* at 253-56, 487-87.

On his way out of the bar, Elkins shoved Mola's stool. *Id.* at 488-89, 741-42, 775-76. In response, Mola exclaimed, "Oh hell, no," pulled out his handgun, and cocked it. *Id.* at 393, 693-95, 742-43, 983-84, Security staff tried to stop Mola as he briskly pursued Elkins and his friend out of the bar, but he told them, "Get the fuck off me," which they did after noticing his gun. *Id.* at 573-75, 935-36. In the parking lot, Mola approached Elkins his back was turned, yelling, "Hey, fucker!" as he pointed the gun at him. *Id.* at 833-36, 984-85. Standing about twenty feet away from Mola, Elkins turned, displayed his hands at his sides, and asked, "What, are you going to shoot me?" *Id.* at 579-82, 942-43, 985-991. He got his unfortunate answer a second later; Mola shot him twice in quick succession, and Elkins grabbed his stomach and fell to the ground. *Id.* He died at a hospital later that night. *Id.* at 226-28, 915-16.

Another patron tackled Mola to the ground and dropped his gun. *Id.* at 582-84, 991-92. Pinned on the ground, Mola said, "I fucked up. I fucked up," and asked for his gun back so that he could shoot himself, though the patron declined. *Id.* Police officers arrived and arrested Mola. *Id.* at 1039-40, 1059-60, These police officers testified that, while still in the parking lot, Mola told them unprompted, "I know I shouldn't have shot him. It wasn't justified. It wasn't justified." *Id.* He said, "The guy slapped the glasses off my head and kicked my chair. When you go off, you go off." *Id.*

Mola also testified at trial, and his account on the objective facts differed from the other eyewitnesses in only a few respects. According to Mola, as the victim kicked his chair on his way out, he whispered, "This isn't over." *Id.* at 1303. Further, Mola pointed the gun at the victim only after he turned and shot the victim only after he took five or six steps toward Mola. *Id.* at 1311-12, 1375. When the victim continued to walk toward Mola, he shot him again. *Id.* at 1313-14.

Mola explained his decision to pursue the victim with a gun in hand as follows:

**Trial Counsel:** All right. Then do you see where he goes?

**Mola:** I turned, and I saw him walk out.

**Trial Counsel:** And what did you do?

**Mola:** I thought, well, this guy is crazy, and I said I don't know what he's about to do now. And I thought, well, what he's about to do is get to his car. And I just thought to myself, I'm not going to wait here like a sitting duck, you know. I had already appealed to the bouncers, and they obviously weren't sympathetic to what was going on.

4

> **Trial Counsel:** Okay. So, you thought this through, and you felt like I can't get any help here, is that right?
>
> **Mola:** It just kind of felt like I had seconds to act before this guy got to a car and possibly grabbed something.
>
> \* \* \*
>
> **Trial Counsel:** So, what did you do then?
>
> **Mola:** Well, I do own a gun, and, like I said, I thought I had a permit for it, so I pulled the gun, and I cocked it. I didn't know what I was walking out into when I went out there, and so I went out there. And I thought if I could catch him before he got to a car and showed him that I had a gun and, basically, let him know, look, if you have anything else in store for me, it's not going to happen. You're going to have to get in your car and leave.

Trial Tr. 1298-99.

Mola also disputed the police officers' testimony that they did not prompt his statements and explained that his comment that the shooting was not justified was based on his mistaken understanding of self-defense. *Id.* at 1327-29. He explained, " I thought that the law was, unless a person was pointing a gun at you or something along those lines, you were not to ever pull a trigger on them." *Id.* at 1329. After closing arguments, the jury found Mola guilty of voluntary manslaughter. *Id.* at 1575-76. He was sentenced to thirty years.

## Description of the Claims

Mola makes four claims, the first of which can be disposed of quickly. He claims he did not receive adequate due process during State post-conviction proceedings. He concedes that federal courts have found that procedural errors during post-conviction proceedings are not a cognizable basis for habeas relief because there is no

5

constitutional right to State post-conviction proceedings at all. *See Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987); *Tabb v. Christianson*, 855 F.3d 757, 767 (7th Cir. 2017). He nevertheless asks me to consider such a claim in this case. To grant Mola habeas relief on this basis, I would have to find that the State court's procedural rulings at the post-conviction stage "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *See* 28 U.S.C. § 2254(d)(1). But because the Supreme Court has determined that there is no constitutional right to State post-conviction proceedings, this claim is a nonstarter, and nothing more need be said about it.

Mola's other three claims are: (1) that his lawyer was ineffective for failing to retain a toxicology expert; (2) the prosecution's failure to disclose a police report helpful for the impeachment of a witness was a constitutional violation under *Brady* and *Giglio;* and (3) that he is entitled to habeas relief because he received ineffective assistance of counsel with respect to a missing verdict form from the first trial. I will address these claims in order below after first dealing with a messy issue of procedural default.

Procedural Default

Before considering the merits of a habeas petition, I must first delve into the murky world of procedural default. 28 U.S.C. § 2254(b)(1)(A); *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004). This involves navigating a byzantine construct burdened with procedural traps for the unwary. Make one misstep, and your case is a goner. One of those traps is called "fair presentment." What it means is that to get to the merits of a

case a petitioner must fully and fairly present his federal claims to the state courts. *Boyko v. Parke*, 259 F.3d 781, 788 (7th Cir. 2001). Fair presentment "does not require a hypertechnical congruence between the claims made in the federal and state courts; it merely requires that the factual and legal substance remain the same." *Anderson v. Brevik*, 471 F.3d 811, 814–15 (7th Cir. 2006) (citing *Boyko*, 259 F.3d at 788). It does, however, require "the petitioner to assert his federal claim through one complete round of state-court review, either on direct appeal of his conviction or in post-conviction proceedings." *Lewis*, 390 F.3d at 1025 (internal quotations and citations omitted). "This means that the petitioner must raise the issue at each and every level in the state court system, including levels at which review is discretionary rather than mandatory." *Id.* at 1025-26. "A habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted that claim." *Id.* at 1026.

Mola properly presented his ineffective assistance of counsel claims to the Lake Superior Court, the Court of Appeals of Indiana, and the Indiana Supreme Court. ECF 12-10 at 26-39; ECF 12-13 at 11-15; ECF 12-14 at 9-12. Mola presented his failure to disclose impeachment evidence claim for the first time in a motion to remand filed with the Court of Appeals and also presented it in his petition to transfer to the Indiana Supreme Court. ECF 12-14 at 14-15; ECF 12-15. Mola did not raise this claim with the Lake Superior Court, and the State appellate courts did not waive or otherwise address this procedural deficiency except to summarily deny the motion to remand. ECF 12-4 at 11. While it is clear that Mola did not satisfy the fair presentment requirement, the

parties dispute whether the claim is procedurally defaulted or merely an unexhausted claim that Mola could still raise in State court through a successive petition for post-conviction relief.

>Section 12(b) of the Indiana Rules of Post-Conviction Remedies states as follows:
>
>The [appellate courts][1] will authorize the filing of the [successive] petition if the petitioner establishes a reasonable possibility that the petitioner is entitled to post-conviction relief. In making this determination, the court may consider applicable law, the petition, and materials from the petitioner's prior appellate and post-conviction proceedings including the record, briefs and court decisions, and any other material the court deems relevant.

For the reasons discussed below, I conclude that Mola could not establish a reasonable possibility that the failure to disclose claim would entitle him to post-conviction relief in State court. This conclusion is also supported by the State courts' refusal to remand Mola's case for further post-conviction proceedings with respect to this claim. Because Mola could not obtain the authorization to present this claim in a successive petition, it is procedurally defaulted.

Mola maintains that I should excuse his procedural default because the prosecution prevented him from presenting this claim to the Lake Superior Court by failing to disclose the police report that is the subject of his claim during the discovery stage of his criminal proceedings. A habeas petitioner can overcome a procedural default by showing both cause for failing to abide by state procedural rules and a

---

[1] "[B]efore a petitioner may file a successive post-conviction relief petition, a petitioner must request and receive leave to pursue a successive petition from either this Court or the Indiana Supreme Court." *Love v. State*, 52 N.E.3d 937, 939–40 (Ind. App. 2016).

8

resulting prejudice from that failure. *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977); *Wrinkles v. Buss*, 537 F.3d 804, 812 (7th Cir. 2008). Cause sufficient to excuse procedural default is defined as "some objective factor external to the defense" which prevented a petitioner from pursuing his constitutional claim in state court. *Murray v. Carrier*, 477 U.S. 478, 492 (1986). The record reflects that Mola obtained the police report on his own through public records requests in May 2017. ECF 12-15 at 7. Consequently, it is unclear why Mola could not have obtained this report and presented this claim to the Lake Superior Court during post-conviction proceedings, which concluded more than five years after his trial. ECF 12-1 at 9-10; ECF 12-2 at 30. Nevertheless, the prosecution arguably should have produced the report during pretrial discovery, so I will assume without deciding that Mola has demonstrated cause and prejudice and consider the merits of the failure to disclose claim.[2]

## Discussion

Having worked our way through the procedural thicket that plagues habeas corpus litigation, it is now on to the merits of the claims. But first, some basics about the standards that govern the decision making. Habeas corpus is an important error correction tool that helps to ensure the proper functioning of the criminal justice system. But the available relief is very limited. "Federal habeas review . . . exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for

---

[2] Notably, federal courts have the discretion to consider claims for habeas relief under certain circumstances even if such claims are procedurally barred. 28 U.S.C. § 2254(b)(2).

ordinary error correction through appeal." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (quotations and citation omitted).

Habeas relief can only be granted in one of two ways: if it is shown that the adjudication of the claim by the state court resulted "in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or if the state court decision was based "on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). This is a demanding standard that has been described by the Supreme Court as being intentionally difficult to meet. "We have explained that clearly established Federal law for purposes of §2254(d)(1) includes only the holdings . . . of this Court's decisions. And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Woods*, 135 S. Ct. at 1376 (quotation marks and citations omitted). What this means is that to succeed on a habeas claim the petitioner must show that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement." *Id.* In other words, a "state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

### 1. Ineffective Assistance of Counsel - Toxicology Expert

Mola argues that he is entitled to habeas relief because trial counsel did not adequately investigate the effect of alcohol on the victim and did not retain a toxicology expert to testify on the effects of alcohol and Prozac. He maintains that such evidence would have supported his testimony that the victim was irrational and aggressive and that the victim had advanced on him in the parking lot.

To prevail on an ineffective assistance of counsel claim in the State courts, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668 (1984). There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689. The test for prejudice is whether there was a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In assessing prejudice under *Strickland* "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112. However, "[o]n habeas review, [the] inquiry is now whether the state court unreasonably applied *Strickland*. . ." *McNary v. Lemke*, 708 F.3d 905, 914 (7th Cir. 2013). "Given this high standard, even 'egregious' failures of counsel do not always warrant relief." *Id.* (citing *United States v. Draves*, 103 F.3d 1328, 1335 (7th Cir. 1997)).

At the post-conviction stage, the Court of Appeals of Indiana rejected this claim, relying on trial counsel's testimony at the PCR hearing that he believed expert

11

testimony on the effects of alcohol and Prozac would have been cumulative given the ample testimony regarding the victim's use of Prozac and consumption of alcohol and that such testimony could have harmed Mola by causing the jury to focus on the effect of alcohol on him. ECF 12-13 at 13-15. The appellate court found that trial counsel's performance was not deficient and did not prejudice Mola, agreeing that such expert testimony would have been cumulative given the testimony regarding the victim's intoxication. *Id.*

After reviewing the record, I cannot conclude that the State court made an unreasonable determination regarding trial counsel's decision to not present a toxicologist as an expert witness. Recall that an unreasonable application of a Supreme Court holding requires a showing that the decision is "objectively unreasonable, not merely wrong; even clear error will not suffice." *Woods*, 135 S. Ct. at 1376. Mola does not come close to meeting that lofty standard here. The record contains ample evidence to suggest that Elkins was under the influence at the time of shooting, including testimony that he had been drinking and that he took Prozac on a daily basis. Trial Tr. 232-33; 273-75, 502-03. More significantly, the evidence overwhelmingly demonstrated the irrational, aggressive behavior that Elkins engaged in inside the bar, which consisted of him fixating on Mola despite no previous interaction, confronting him with baseless accusations of being a police officer and challenges to his masculinity, knocking his glasses off his head and stomping on them, and forcefully shoving his stool on the way out. In other words, the record is replete with evidence that Elkins behaved like a classic bully that night. But the jury nonetheless found that is not reason to shoot a man dead.

On this record, no reasonable juror could have questioned that the victim had an abnormal state of mind that night, whether or not induced by alcohol or Prozac, so the lack of a toxicology expert did not prejudice Mola. It simply would not have added a whole lot to this story. The jury was made well aware by Mola's excellent trial counsel of Elkins' aggressive mindset that night. Therefore, I agree with the Indiana Court of Appeals' determination that "any evidence from a toxicologist would have likely been cumulative . . ." [ECF 12-13 at 15.] In sum, the failure to retain a toxicology expert is not a basis for habeas relief.

## 2. Prosecutorial Misconduct - Failure to Disclose Material Evidence

Mola argues that he is entitled to habeas relief because the prosecution failed to disclose material impeachment evidence. Specifically, he refers to a police report from the Lake County Police Department in which an officer represented that, a month prior to the incident, the police had been called by the victim's stepson regarding a physical altercation at the victim's residential address. ECF 51-1 at 96-100. The officer arrived at the residence but left when officers from Porter County arrived because it was outside of his jurisdiction.[3] *Id.* Mola has also submitted a police report from the Porter County Police Department identifying the victim as the stepdad and noting that neither party sought further action. *Id.* at 104-05.

---

[3] Mola obtained this record through a request targeting the victim's former residential address. ECF 12-15 at 7. Though the issue of whether this failure to disclose was intentional or inadvertent is irrelevant for purposes of resolving this claim, it seems likely the prosecution did not disclose this report due to the fact that only the stepson, who has a different last name than the victim, is named in it.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule." *U.S. v. Bagley*, 473 U.S. 667, 676 (1985). "[F]avorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (internal quotations and citation omitted).

At trial, Elkins' spouse testified that Elkins had played golf and attended a baseball game before going to the bar and further testified about her experience at the hospital after the shooting. Trial Tr. 224-28. On cross-examination, she testified as follows:

> **Trial Counsel:** Have you been around Mr. Elkins when he's drinking before?
>
> **Witness:** Yes.
>
> **Trial Counsel:** And have you had occasion to observe him intoxicated?
>
> **Witness:** Yes.
>
> **Trial Counsel:** Let me put this as best I can. Some people are boisterous and animated when they're drinking. Some get quiet and solemn. Some are lovers, and some are fighters. Where do you put him on that scale, or was he one way ever?

> **Witness:** He was fine. He was never aggressive if that's what you're asking.
>
> **Trial Counsel:** Would there be times--never aggressive drinking?
>
> **Witness:** Never aggressive, drinking or otherwise.

*Id.* at 230-31.

Mola argues that this police report would have allowed trial counsel to impeach Mrs. Elkins testimony that her husband never acted aggressively and would have persuaded the jury to credit his testimony that Elkins approached him in the parking lot with violent intentions. Notably, her testimony as a whole was largely immaterial given the number of eyewitnesses at the bar and the fact she was not one of them. Further, the testimony that Elkins never acted aggressively was thoroughly discredited by the overwhelming and undisputed evidence of the victim's bizarre and aggressive behavior inside the bar. Additionally, to the extent that Mola suggests that the police report could have been used for the purpose of showing the victim's propensity for aggression, evidence could not have been admitted for that purpose. Ind. R. Evid. 404(b). Therefore, the claim that the prosecution failed to disclose the police report is not a basis for habeas relief.

### 3. Ineffective Assistance of Counsel - Verdict Forms

Mola argues that he is entitled to habeas relief because trial counsel did not inspect the verdict forms after his first trial in April 2010, which resulted in a mistrial. ECF 12-1 at 6. He contends that the failure to inspect these forms prevented him from asserting a failure to preserve evidence claim during post-conviction proceedings.

15

"[T]he destruction of potentially exculpatory evidence violates the defendant's right to due process if (1) the State acted in bad faith; (2) the exculpatory value of the evidence was apparent before it was destroyed; and (3) the evidence was of such a nature that the petitioner was unable to obtain comparable evidence by other reasonably available means." *McCarthy v. Pollard*, 656 F.3d 478, 485 (7th Cir. 2011) (citing *Arizona v. Youngblood*, 488 U.S. 51 (1988)). "The analysis [for failure to preserve claims] under the Indian[a] Constitution is identical to the federal analysis." *Terry v. State*, 857 N.E.2d 396, 406 n.8 (Ind. Ct. App. 2006) (citing *Stoker v. State*, 692 N.E.2d 1386, 1390 (Ind. Ct. App. 1998)).

After the trial court declared the first trial to be a mistrial, trial counsel interviewed the jurors. Appeal App. 159-60. The jurors verbally informed trial counsel that they had agreed not to convict Mola of murder or voluntary manslaughter but could not decide whether they should convict him of involuntary manslaughter or acquit him of all charges. *Id.* Trial counsel memorialized this information in an affidavit and presented it in an unsuccessful effort to persuade the trial court to dismiss the charges of murder and voluntary manslaughter and to retry Mola only on the charge of involuntary manslaughter. *Id.* at 138-86. At the post-conviction stage, Mola requested the verdict forms from the first case, but the Lake Superior Court responded that they could not locate them. ECF 12-1 at 13. They were never filled out because the jury couldn't agree on a verdict. In other words, the forms were blank and therefore, likely discarded. It's for this reason that the Court of Appeals of Indiana summarily rejected this ineffective assistance of counsel claim on the basis that it was unlikely that the jury

16

completed verdict forms given that they did not reach a verdict, and Mola had submitted no evidence to the contrary. ECF 12-13 at 13.

I agree that Mola would have needed some evidence that the jury had reduced their decision to acquit Mola on certain charges in writing to prevail, but this is only one of numerous defects with this claim. Mola also offers no explanation for why he believes that the State destroyed these blank verdict forms in bad faith or why his trial counsel's affidavit regarding the jury's statements is not a comparable alternative for the verdict forms or even a superior alternative given the likelihood that the jury left the forms blank. Moreover, a jury's decision to acquit is simply not exculpatory—it does not represent a finding that the criminal defendant was innocent or did not commit the crime but instead represents the determination that the prosecution did not satisfy the burden of proving beyond a reasonable doubt that the defendant committed the crime as charged. *See e.g.*, *U.S. v. Mendoza-Acevedo*, 950 F.2d 1, 4 (1st Cir. 1991) ("Our criminal jurisprudence is premised on the fact that a defendant is entitled to a 'not guilty' verdict, whether or not the jurors believe he is innocent, if the government fails to meet its burden of proving guilt beyond a reasonable doubt."); *U.S. v. Isom*, 886 F.2d 736, 738 (4th Cir. 1989) ("A verdict of acquittal demonstrates only a lack of proof beyond a reasonable doubt; it does not necessarily establish the defendant's innocence."); BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "exculpatory evidence" as "evidence tending to establish a criminal defendant's innocence."). Therefore, the claim that trial counsel did not inspect the verdict forms is not a basis for habeas relief.

17

Certificate of Appealability

Pursuant to Section 2254 Habeas Corpus Rule 11, I must grant or deny a certificate of appealability. To obtain a certificate of appealability under 28 U.S.C. § 2253(c), the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that a reasonable jurist could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotations and citations omitted). For the reasons explained in this order, there is no basis for encouraging Mola to proceed further.

For these reasons, the court DENIES the habeas corpus petition; DENIES a certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11; and DIRECTS the clerk to enter judgment in favor of the Respondent and against the Petitioner.

SO ORDERED on October 20, 2020

s/Philip P. Simon
JUDGE PHILIP P. SIMON
UNITED STATES DISTRICT COURT